**Opinion filed September 2, 2010**



# In The

# Eleventh Court of Appeals

_____

## No. 11-08-00262-CR

_____

## DEBORAH BOWEN, Appellant

## V.

## STATE OF TEXAS, Appellee

**On Appeal from the 32nd District Court**

**Fisher County, Texas**

**Trial Court Cause No. 3313**

### O P I N I O N

This case involves a family trust established by the will of Alfred P. Douglass. The initial primary beneficiary was his wife. Upon her death, the trust was to terminate, and its assets distributed equally to their children: appellant Deborah Bowen and her brother or their descendants per stirpes. A jury convicted appellant of misapplication of fiduciary property owned by Dana White (or held for her benefit) of the value of $200,000 or more. *See* TEX. PENAL CODE ANN. § 32.45 (Vernon Supp. 2009). Appellant was sentenced to eight years in the Texas Department of Criminal Justice – Institutional Division, assessed a $10,000 fine, and

ordered to pay restitution in the amount of $350,000 to Dana White and her brothers, Cody Douglass and Michael Douglass, who were the children of appellant's deceased brother.

In her first two issues, appellant contends that the evidence was legally and factually insufficient to prove each element required for a finding of misapplication of fiduciary property. In her third and fourth issues, appellant contends that the evidence was legally and factually insufficient to prove appellant committed a first degree felony because the evidence did not show that over $200,000 of trust assets were owned by Dana White or held for her benefit. Although there is substantial evidence that appellant as trustee misapplied more than $200,000 of the family trust corpus in question, the evidence is legally insufficient to show that $200,000 of trust assets that were misapplied were owned by Dana White or held for her benefit. At most, slightly over $100,000 of trust assets were owned by Dana White or held for her benefit. The jury charge did not include a lesser offense. We reverse and enter a judgment of acquittal.

*Standard of Review*

In order to determine if the evidence is legally sufficient, the appellate court reviews all of the evidence in the light most favorable to the verdict and determines whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Laster v. State*, 275 S.W.3d 512, 517-18 (Tex. Crim. App. 2009); *Jackson v. State*, 17 S.W.3d 664, 667 (Tex. Crim. App. 2000). To determine if the evidence is factually sufficient, the appellate court reviews all of the evidence in a neutral light. *Laster*, 275 S.W.3d at 519; *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); *Johnson v. State*, 23 S.W.3d 1, 10-11 (Tex. Crim. App. 2000); *Cain v. State*, 958 S.W.2d 404, 407-08 (Tex. Crim. App. 1997); *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996). Then, the reviewing court determines whether the evidence supporting the verdict is so weak that the verdict is clearly wrong and manifestly unjust or whether the verdict is against the great weight and preponderance of the conflicting evidence. *Watson*, 204 S.W.3d at 414-15; *Johnson*, 23 S.W.3d at 10-11.

The appellate court reviews the factfinder's weighing of the evidence and cannot substitute its judgment for that of the factfinder. *Cain*, 958 S.W.2d at 407; *Clewis*, 922 S.W.2d at 133. Due deference must be given to the factfinder's determination, particularly concerning the weight and credibility of the evidence. *Johnson*, 23 S.W.3d at 9; *Jones v. State*, 944 S.W.2d 642 (Tex. Crim. App. 1996). The jury, as the finder of fact, is the sole judge of the weight and

2

credibility of the witnesses' testimony. TEX. CODE CRIM. PROC. ANN. art. 36.13 (Vernon 2007), art. 38.04 (Vernon 1979). This court has the authority to disagree with the factfinder's determination "only when the record clearly indicates such a step is necessary to arrest the occurrence of a manifest injustice." *Johnson*, 23 S.W.3d at 9.

*Background Facts*

Alfred P. Douglass died in March 2001, leaving a substantial estate. The community estate was valued at $1,723,991.63; Alfred's one-half was valued at $861,995.82. He was survived by his wife, Parnice W. Douglass, and his two children, Jackie Douglass and appellant. Alfred's will established the Alfred P. Douglass Trust, which utilized the Federal Unified Gift and Estate Tax Credit to exclude the amount placed in the marital trust from estate taxes. Parnice was the primary beneficiary; and, upon her death, the trust assets were to be distributed to Alfred's living descendants per stirpes. The trust account was funded with $673,219 in an account at Edward D. Jones & Co. (Edward Jones) in Sweetwater. The initial co-trustees were Parnice and Jon Bergstrom of Edward Jones. The trust produced an income of approximately $33,000 in 2002.

Jon Bergstrom of Edward Jones, Alfred's financial adviser for eighteen years, testified that the purpose of the trust was to take advantage of the unified tax credit under the inheritance tax exemption.[1] Bergstrom invested the trust assets in tax-free municipal bonds because Alfred did not want the trust to invest in risky assets or to pay taxes on its income. According to Bergstrom, Alfred wanted the trust assets to remain invested and increase until both he and his wife had died.

After Alfred's death, Jackie Douglass became the primary caretaker of Parnice. He lived in the same town as Parnice and farmed his own land and land owned by Parnice. Jackie died unexpectedly in October 2002. He was survived by his three children: Dana White, Cody Douglass, and Michael Douglass. Appellant and Parnice served as administrators of Jackie's estate.

Appellant became the caretaker of Parnice after Jackie's death. In October 2002, the month that Jackie died, Parnice executed a statutory durable power of attorney naming appellant as her attorney-in-fact. The power of attorney gave appellant the power to handle all of

---

[1]Although Bergstrom referred to it as the inheritance tax exemption, he was referring to the federal estate tax exemptions and credits that are part of the Unified Gift and Estate Tax system. *See* 26 U.S.C. §§ 2001(a), 2010 (unified credit against estate tax), and 2056 (marital exemption). The credit at that time was $675,000.

Parnice's financial affairs. In the summer of 2004, appellant and her husband moved into Parnice's home and became her full-time caretakers. Jon Bergstrom was asked to resign as co-trustee of the trust, and Parnice appointed appellant as the successor co-trustee. At the time appellant was appointed co-trustee in May 2004, the balance in the trust account was $620,065. Within three years, appellant had reduced the trust account to $12,000.

It had taken Alfred and Parnice a lifetime to build an estate of $1,723,991. At the time of Alfred's death, Parnice had inherited $188,776 (Alfred's one-half minus the $673,219 placed in the trust) from Alfred and her one-half of the community estate was valued at $861,995. Thus, in addition to being the primary beneficiary of the trust, Parnice had assets of $1,050,772 when Alfred died in March 2001. When Parnice died in March 2006, five years after Alfred died, appellant had reduced Parnice's assets from $1,050,772 to an estate of $603,879.87. All of Parnice's investments in bonds and cash had disappeared; the land owned by Parnice at her death amounted to $592,000 of the $603,879 according to Parnice's probate inventory filed by appellant. At the time of Parnice's death, the trust had assets of approximately $376,584, but appellant as trustee did not distribute one-half of the assets to Jackie's children as required by the trust provisions. Appellant ultimately distributed all of the remaining trust assets to herself. By December 2006, the trust only had a balance of $124,435.61. The Edward Jones statement for January 1 – 26, 2007, reflects a trust balance of zero. Jason Blake of Edward Jones testified that there was only $12,000 in the trust account when Edward Jones received a *lis pendens* freezing the account.

The trust provided that the co-trustees could distribute income and principal from the trust to Parnice:

> [A]s are necessary, when added to the funds reasonably available to her from all other sources known to [the] Trustee to provide for her health, support, maintenance and education, taking into consideration her age, education and station in life.

The co-trustees, in their discretion, could also make distributions from the trust to any of Alfred Douglass's descendants:

> [A]s are necessary, when added to the funds reasonably available to [them] from all other sources known to [the] Trustee, to provide for their health, support, maintenance and education, taking into consideration their age, education and station in life.

4

Parnice had significant funds reasonably available to her from sources other than the trust. At about the same time the trust was set up, Parnice also had a separate account with Edward Jones in the amount of $293,336. Parnice owned approximately 1,100 acres, and she was earning income from a lease of the land to Terry Lee Coker. Parnice also had income from Social Security, income from her IRA account, and a separate banking account at Hamlin National Bank that had an average balance of between $75,000 to $200,000 during Alfred's lifetime. At the time of her death in March 2006, Parnice had a balance of $217,000 in that account, although we note that appellant did not list that amount in the probate inventory she filed on behalf of Parnice's estate.

Shortly after Jackie's death, appellant and Parnice opened a joint checking account numbered 791-07863 with right of survivorship at Edward Jones. The joint checking account was initially funded with money from another account owned by Parnice; subsequently, $5,000 was withdrawn from the trust and put in the joint account. Bergstrom had concerns because the joint tenancy account could be used to avoid the equal division provisions (one-half to Jackie and his descendants and one-half to appellant and her descendants) of the trust.

Bergstrom's concerns were justified. In August 2003, $60,000 was withdrawn from the trust account (apparently by Parnice as co-trustee) and put into the joint account. Appellant testified that the $60,000 was to help appellant and her husband and that the earlier $5,000 was a loan to Jackie. Bergstrom resigned as co-trustee in May 2004, and Parnice appointed appellant as co-trustee. On numerous occasions, appellant then transferred money from the trust to her own account, her joint account with Parnice, or to Parnice's account. And appellant had a power of attorney from Parnice that allowed her to withdraw funds from Parnice's separate accounts. Beginning with the first $5,000 withdrawal from the trust on December 18, 2002, a total amount of $329,140.20 was withdrawn from the trust and placed in the joint account by April 2006.

Expenditures utilizing trust funds included a 1998 GMC Yukon SUV titled in appellant's name, many pieces of farm equipment, several farm tractors, several trailers, trucks, jeeps, an old Cadillac, a sand buggy, a Caterpillar bulldozer, a trailer to carry the bulldozer, an asphalt spreader, a Case backhoe, and many other items. None of the items were ever titled in the name of the trust.

Appellant acknowledged that the trust was funded with $673,219 when Alfred died and that, by May 2002, the trust account had increased to $687,000. She also acknowledged that the

5

titles to the farm equipment, tractors, trailers, trucks, jeeps, bulldozer, backhoe, and other items were usually put in her name. On February 17, 2006, a month before Parnice died, trust funds were used to purchase a $25,000 motor home from Fun Time RV. Appellant said that she sold the motor home after Parnice's death and kept the money. Two days before Parnice died, appellant used trust funds to purchase a classic Thunderbird for $25,000. Appellant sold it after Parnice's death, realizing a $9,000 profit. Appellant kept the proceeds.

There were a number of checks, funded from trust funds, in the amount of $3,000 payable to the Office of the Standing Trust in connection with appellant's bankruptcy restitution payments. Appellant explained that, at the time of Parnice's death in March 2006, appellant was still paying $3,000 a month to her creditors in bankruptcy.

Appellant testified that the construction business she owned with her husband had filed for bankruptcy in 2002. Although appellant testified that all of the trucks, jeeps, trailers, a dozer, and a backhoe were purchased for the farm, a more reasonable inference is that appellant purchased them with trust funds for her construction business or for the benefit of her and her husband, not for the benefit of Parnice. Appellant testified that Parnice wanted to get back into farming after Alfred died in 2001. Both Alfred and Parnice were eighty-one years of age in 2001. They had quit farming years before. Terry Lee Coker, who lives in Roby near Sylvester, testified that Alfred had turned over the farming to him. Coker worked the land on a crop-sharing basis, paying Alfred and Parnice 25% of the crop proceeds. If Coker did not make a crop, he would pay them 25% of the crop insurance. He paid Parnice's estate 25% of the crop insurance that he collected in the year that Parnice died. There is no evidence that appellant or her husband knew anything about farming. Farming, a risky enterprise, was something that appellant and her husband wanted to try. It was not for the benefit of Parnice or "to provide for her health, support, maintenance and education, taking into consideration her age, education and station in life."

The jury returned a unanimous verdict that, as a fiduciary, appellant had intentionally, knowingly, or recklessly misapplied property of more than $200,000 owned by Dana White or held for her benefit.

6

*Analysis*

Section 32.45 of the Texas Penal Code defines the offense of misapplication of fiduciary property, providing in pertinent part:

> A person commits an offense if he intentionally, knowingly, or recklessly misapplies property he holds as a fiduciary or property of a financial institution in a manner that involves substantial risk of loss to the owner of the property or to a person for whose benefit the property is held.

Section 32.45(b).

When a valid trust is created, the beneficiaries become the owners of the equitable or beneficial title to the trust property and are considered the real owners. *Faulkner v. Bost*, 137 S.W.3d 254, 258 (Tex. App.—Tyler 2004, no pet.); *City of Mesquite v. Malouf*, 553 S.W.2d 639, 644 (Tex. Civ. App.—Texarkana 1977, writ ref'd n.r.e.). Pursuant to the Texas Trust Code, one of the methods a trust may be created is by "a property owner's testamentary transfer to another person as trustee for a third person." TEX. PROP. CODE ANN. § 112.001(3) (Vernon 2007). The trustee is merely the depository of the bare legal title. *Faulkner*, 137 S.W.3d at 258-59. The trustee is vested with legal title and right of possession of the trust property but holds it for the benefit of the beneficiaries, who are vested with equitable title to the trust property. *Id.* at 259; *Jameson v. Bain*, 693 S.W.2d 676, 680 (Tex. App.—San Antonio 1985, no writ). As a beneficiary, Dana White was one of the real owners of the trust assets.

As trustee of the trust, appellant owed a fiduciary duty to the trust and its beneficiaries. Appellant also served as a fiduciary to Parnice in handling all of Parnice's financial affairs under the power of attorney executed by Parnice. The record amply supports the jury's conclusion that appellant engaged in the misapplication of the trust assets and used them for appellant's own benefit. *See Tyler v. State*, 137 S.W.3d 261 (Tex. App.—Houston [1st Dist.] 2004, no pet.). Although the question was not before the jury, there is also sufficient evidence in the record for the jury to have concluded that appellant also engaged in the misapplication of Parnice's assets. At the time of Parnice's death in March 2006, the trust still had assets of $376,584. Appellant distributed all of those assets to herself instead of distributing one-half to Jackie's children immediately after Parnice's death when the trust terminated. After Alfred died in March 2001, Parnice had assets of $1,050,772. When Parnice died five years later, appellant had reduced Parnice's assets to $603,879.87 according to the estate inventory filed by appellant.

7

Shortly before Parnice died, appellant contacted an attorney, David DeFoore, to prepare a new will for Parnice that would leave all of Parnice's estate to appellant. DeFoore testified that he prepared the will at appellant's request but that he never spoke with Parnice. Tom Reese Jr. testified that he had prepared similar wills for Alfred and Parnice; Parnice's earlier will split her estate between Jackie and appellant (or their respective descendants if one should die before Parnice). By having Parnice execute a new will in Parnice's final days, appellant made certain that Jackie's children would not participate in any of the assets that Alfred and Parnice had accumulated.

Alfred and Parnice had executed their wills at the same time in February 2000. Bergstrom of Edward Jones testified that he had been involved in discussions with Alfred and Parnice that led them to consider a trust in their wills. Their goal was to take advantage of the unified estate tax credit to pass property free of estate taxes to their descendants. They also wanted the trust to be set up to avoid income taxes. Bergstrom said that Alfred had his Edward Jones account invested only in tax exempt municipal bonds and that he wanted Bergstrom to invest the trust assets the same way. According to Bergstrom, Alfred wanted the trust to reinvest all income and then be terminated at the death of himself and Parnice.

Appellant argues that the State did not prove that she intentionally, knowingly, or recklessly misapplied the property because she did not know the terms of the trust. Yet she also argues that she did not violate the terms of the trust. Appellant, as a trustee, had a duty to administer the trust in good faith according to its terms. *See* TEX. PROP. CODE ANN. § 13.051 (Vernon 2007). Before expenditures from the trust were to be made for Parnice's benefit, the trustees were to take into consideration her other sources of income and her age and station in life. Parnice had ample sources of income that should have been considered, and she had always lived modestly. The record reflects that appellant spent a lot of the money from the trust and from Parnice's accounts to directly benefit herself and her husband. There is sufficient evidence in the record for the jury's finding that appellant intentionally, knowingly, and recklessly misapplied property of the trust that she held as fiduciary in a manner that involved substantial risk of loss to the owner of the property and to beneficiaries of the trust.

Appellant had Parnice execute a new will during Parnice's final days; obviously, appellant knew the terms of Parnice's earlier will. Both wills contained the same trust provisions according to the attorney, Reese, who prepared the wills. The jury placed little or no credibility

on appellant's testimony that she did not know the provisions of the trust. Appellant's first and second issues are overruled.

Appellant's third issue contends that the State's evidence was legally insufficient to prove appellant committed a first degree felony because there is insufficient proof that over $200,000 in trust assets were owned by Dana White or held for her benefit. Had the indictment listed Parnice, Dana White, Cody Douglass, and Michael Douglass as owners of the equitable or beneficial title to the trust property and as persons "for whose benefit the property was held," this would be an easy case. However, the indictment only listed Dana White as "the owner of said property, and the person for whose benefit the property was held" by appellant as a fiduciary. We find that the record is legally insufficient to support the verdict that appellant misapplied over $200,000 of trust assets owned by Dana White or that were held for the benefit of Dana White. It appears that at most only slightly over $100,000 of trust assets were owned by Dana White or held for her benefit. And the jury charge did not include a lesser included offense.

The State argues that Dana White had a power of attorney from both of her brothers, Cody Douglass and Michael Douglass; therefore, Dana White had a greater right of possession to one-half of the trust than appellant did. Analyzing "ownership" in terms of right of possession does not help the State. Cody Douglass executed his durable power of attorney on June 23, 2006, and Michael Douglass executed his durable power of attorney on April 5, 2006. The powers of attorney authorized Dana White to act as their agent in pursuing their claims involving their father's estate against appellant. The terms of the trust determined who the owners were or for whose benefit the trust assets were held, not the powers of attorney. Under the terms of the trust, none of Jackie's children had any right of possession to the trust assets until the trust terminated by its terms on the death of Parnice in March 2006. At that time, the trust had assets of $376,584, one-half of which would be $188,292. Appellant clearly misapplied the $188,292 by distributing that amount to herself, but the indictment accused her of misapplying over $200,000, and Dana White was entitled to only a third of the $188,292 at the date of termination.

The State contends that the jury was entitled to look at appellant's actions from the time she became a co-trustee. We agree, but we still face the problem of whether $200,000 in trust assets were owned by Dana White or held for her benefit. Section 32.45 of the Texas Penal Code provides that the victim of a fiduciary's misapplication of property may be either "the owner of the property" or "a person for whose benefit the property is held." Under *Faulkner*,

9

137 S.W.3d at 258, all of the beneficiaries of the trust were the real owners and persons for whose benefit the trust property was held. When appellant became a trustee in May 2004, the trust asset balance was $620,065. Even ignoring Parnice as an owner and primary beneficiary of the trust, one-half of $620,065 is $310,032. And only one-third of that amount – $103,344 – could reasonably be said to be owned by, or held for the benefit of, Dana White; the other two-thirds would have been for the benefit of her brothers.

The indictment charged appellant with a first degree felony under Section 32.45. The State's evidence was legally insufficient to show that misapplied trust assets owned by Dana White or held for her benefit amounted to $200,000 or more. Appellant's third issue is sustained. We need not reach appellant's fourth issue.

*This Court's Ruling*

The judgment of the trial court is reversed, and a judgment of acquittal is rendered.


TERRY McCALL

JUSTICE


September 2, 2010

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Strange, J.